ROY D. CARLSON v. ROBERT A. FREDSALL AND OTHERS.
MINNEAPOLIS STREET RAILWAY COMPANY AND OTHERS, APPELLANTS.[1]

May 27, 1949.

Nos. 34,663, 34,676.

---

[1]Reported in 37 N. W. (2d) 744.

*John F. Dulebohn* and *Lawrence O. Larson,* for appellants Minneapolis Street Railway Company and Lloyd A. Worthley.

*R. T. Lilly* and *Orr, Stark & Kidder,* for appellant Robert A. Fredsall.

*Thomas H. McMeekin* and *John Ott,* for respondent (plaintiff).

KNUTSON, JUSTICE.

This action to recover for personal injuries was originally brought against defendants Robert A. Fredsall and John Herseth. Thereafter, the complaint was amended so as to include as defendants Minneapolis Street Railway Company and Lloyd A. Worthley. The jury returned a verdict in favor of plaintiff against all defendants. Defendants Fredsall and the Minneapolis Street Railway Company and Worthley have appealed separately from an order denying their respective alternative motions for judgment or a new trial. The appeals have been consolidated here. Defendant Herseth has not appealed.

Many of the facts are not in dispute. Bryant avenue south in the city of Minneapolis runs in a north-south direction. From curb to curb it is 36 feet wide. In the center of the street there are two streetcar tracks. West Thirty-eighth street runs in an east-west direction, intersecting Bryant avenue south at approximately right angles. Streetcar tracks branch off from the main tracks on Bryant avenue so as to form a Y running into Thirty-eighth street on the west side of the intersection, which tracks run for approximately 140 feet west of the intersection. The Y is used for turning cars that go no farther. To the west of the intersection, Thirty-eighth street is 37 feet wide for a distance of approximately 140 feet, or for about the same distance as the tracks forming the Y run west along Thirty-eighth street. To the east of the intersection, Thirty-

eighth street is 32 feet wide, and west of the tracks forming the Y it is likewise approximately the same width. The north side of Thirty-eighth street, on both sides of the intersection, runs in a straight line. Consequently, the difference in width of Thirty-eighth street is all reflected on the south side of the street, where the curb line on the east side of Bryant avenue extends five feet farther north than it does on the west side of Bryant avenue. Thirty-eighth street is a through street, having stop signs on the north and south sides of the intersection on Bryant avenue. Both streets at and for some distance in both directions from the intersection are substantially level.

Buses owned by a subsidiary of the Minneapolis Street Railway Company travel on Thirty-eighth street. On December 21, 1945, about 12:10 a. m., plaintiff was a passenger on one of these west-bound buses. The bus stopped on the northeast corner of the intersection, and plaintiff alighted from the front exit of the bus, passed around the front end of the bus, and crossed the street to the southeast corner of the intersection, where he intended to board a northbound streetcar. Shortly before the bus had stopped, Lloyd A. Worthley, operating a southbound streetcar along Bryant avenue, had come to a full stop north of the intersection for the purpose of taking on some passengers and for the purpose of complying with the stop sign. He then proceeded to the curb line on the north side of the intersection, where he could obtain an unobstructed view of Thirty-eighth street both east and west. His view to the west was obstructed by some large trees until he reached the curb line. He observed a car approaching some distance to the west. He estimated the distance to be about 250 feet. The testimony of the witnesses differs radically as to what he then did. Worthley claims that he went no farther. Other witnesses claim that he proceeded into the intersection and had gone about one-third to one-half or more of the distance through the intersection when John Herseth, driving the car owned by Robert A. Fredsall, entered the intersection. It is not disputed that Herseth approaching on Thirty-eighth from the west swung his automobile to the right, passed in

front of the streetcar, ran up onto the curb on the southeast corner of the intersection, and struck plaintiff, who was then standing either on the sidewalk or near it. The negligence of Herseth is not seriously disputed.

Worthley testified that when he first saw the automobile driven by Herseth it appeared to be traveling fast. The speed of the Herseth car was variously estimated to be from 20 to 45 miles per hour. None of the witnesses claim that the streetcar traveled into the intersection at an excessive rate of speed. Most of them claim that the pavement was somewhat covered with light snow and that the edge was slippery. Herseth contends that the pavement was dry. He did not slacken his pace as he approached and entered the intersection; instead, it was admitted, he increased his speed as he passed or was about to pass in front of the streetcar. It is undisputed that the automobile and streetcar did not touch each other, and it is likewise conceded that, regardless of where the streetcar was when the automobile passed in front of it, the streetcar had come to a stop by that time.

The automobile driven by Herseth was a 1935 Oldsmobile sedan purchased in 1944 by Robert A. Fredsall from his father while Robert was in the navy. On December 19, 1945, Robert, who had just been released from active duty, loaned the automobile to his brother, Roger Fredsall, who was then a student at the University of Minnesota. Roger was president of and active in the affairs of Psi Omega dental fraternity. At the election of officers in December 1945 Herseth was elected to succeed Roger as president. On the day in question, Roger gave Herseth permission to use his brother's automobile to attend to some fraternity business having to do with negotiations pending for a new lease between the fraternity and the owner of the fraternity house.

December 19 was the first time Robert had loaned the car to Roger. Robert was not acquainted with Herseth. Originally, the automobile was loaned to Roger by Robert for the purpose of picking up their sister, who was to arrive on the train Thursday morning, December 20. She did not arrive, so on Thursday Roger called

Robert's home on the telephone and talked to Robert's wife, who gave him permission to retain the car until Friday. Robert had no knowledge of the fact that Roger intended to permit anyone else to use the car besides himself.

On the appeal of the Minneapolis Street Railway Company, two questions are presented for determination: (1) Does the evidence justify submission to the jury of the question of this defendant's negligence and its proximate cause; and (2) was there such prejudicial error committed in the rejection of evidence as to require a new trial?

■ The first proposition relates to the question of causation. It is the contention of the streetcar company that its motorman was not negligent in any respect and that, even if he could be charged with negligence in moving into the intersection, such negligence was not the proximate cause of plaintiff's injuries. It further contends that the negligence of Herseth was an intervening cause insulating any negligence of the motorman which may have existed prior to the negligence of Herseth.

In passing upon the liability of defendants, we must view the evidence in the light most favorable to plaintiff. So doing, the jury could find that Worthley stopped his streetcar north of the intersection for the purpose of taking on passengers and to observe the requirements of the stop sign and that he then moved to the curb line on the north side of the intersection for the purpose of observing traffic on Thirty-eighth street; that he looked to the west and saw the Herseth car coming toward him at a fast rate of speed; that he started into the intersection when Herseth was in close proximity to the west side of the intersection and that when he realized that he could not safely pass in front of the automobile he brought his streetcar to a sudden stop. According to their testimony, the occupants of the streetcar agree that the car did come to an abrupt stop. The testimony of the witnesses varies greatly as to how far the streetcar had traveled into the intersection when this sudden stop occurred. The jury could find that when Herseth realized the impending collision if both automobile and streetcar continued for-

ward he swung his automobile to the right in order to avoid a collision and that as a result thereof he ran up onto the curb on the southeast corner of the intersection and struck plaintiff.

There is no dispute that the south curb line on the east side of the intersection is five feet farther north than it is on the west side of the intersection. If the Herseth automobile was so close to the intersection that a collision was imminent if the streetcar proceeded into the intersection, it was the duty of the streetcar to yield the right of way. If the motorman failed to do so and the sudden movement of the streetcar into the intersection caused the automobile to veer to the right in order to avoid a collision and as a result thereof the automobile ran onto the curb on the southeast corner of the intersection, Worthley's failure to yield the right of way could be negligence, and the jury could find it was a proximate cause.

The mere fact that Worthley tried to avert a collision by suddenly bringing the streetcar to an abrupt stop after he had created the risk to plaintiff by setting in motion a series of events that caused Herseth ultimately to run into plaintiff is not sufficient to relieve Worthley from liability. It is not enough that Herseth was the more negligent. If the negligence of Worthley created the risk to plaintiff, the jury should be left to determine whether such negligence contributed proximately to plaintiff's injuries. Restatement, Torts, § 437.

The action of Herseth in veering to the right was caused directly by Worthley's negligent entry into the intersection in violation of Herseth's right of way. Herseth's veering to the right was a normal response to the stimulus of a situation created by the negligence of Worthley. As such, it was not a superseding cause. Restatement, Torts, § 443.

"* * * The new, independent, intervening cause must be one not produced by the wrongful act or omission, but independent of it, and adequate to bring about the injurious result." Purcell v. St. Paul City Ry. Co. 48 Minn. 134, 138, 50 N. W. 1034, 16 L. R. A. 203.

Prosser, *The Minnesota Court on Proximate Cause,* 21 Minn. L. Rev. 38, says:

"* * * Neither are forces caused or set in motion by the defendant himself to be considered as intervening, since they proceed directly from the defendant's conduct, and he is to be charged with their results."

Had Worthley yielded the right of way, as he should have, Herseth could have continued in a straight line and plaintiff would have been safe. At least, the jury could so find. The mere fact that Herseth was negligent in driving too fast or in failing to keep a proper lookout should not relieve the operator of the streetcar from liability for negligence in causing the Herseth car to veer to the right when the direct cause of plaintiff's injuries was the fact that Herseth did not continue in a straight line and that action on his part was due directly to the negligence of the operator of the streetcar in entering the intersection in such close proximity to the Herseth car as to cause him to suddenly veer to the right in order to avoid a collision. Veering to the right was not an independent force, but the result of the action of the streetcar motorman in moving into the intersection. The questions of the negligence of the motorman and proximate cause were for the jury.

In the original action brought against Robert A. Fredsall and John Herseth, plaintiff alleged that his injuries were *solely* the result of the carelessness and negligence of Herseth and Fredsall. At the time of the trial, the Minneapolis Street Railway Company and Worthley offered to prove by this original complaint that plaintiff had originally commenced the suit against Fredsall and Herseth alone. The complaint was not verified and was signed only by counsel. The offer was rejected.

Some confusion exists as to the admissibility of amended or superseded pleadings, on account of the apparent discrepancy in our former decisions. In Vogel v. D. M. Osborne & Co. 32 Minn. 167, 20 N. W. 129, we held that an amended or superseded pleading is admissible as an admission against the party who interposed it if

verified by him, but that before an unverified pleading could be admitted it must be shown that the party authorized or directed the insertion of the allegations in the pleading.

In Burns v. Maltby, 43 Minn. 161, 45 N. W. 3, we held that it was not error to exclude unverified pleadings in another case involving the same claim where it did not appear that plaintiff had knowledge of its contents.

In Salo v. D. & I. R. R. Co. 121 Minn. 78, 89, 140 N. W. 188, 192, we held that an unverified complaint, superseded by a later complaint, was inadmissible without first showing that plaintiff knew its contents.

In Bakkensen v. Minneapolis St. Ry. Co. 184 Minn. 274, 238 N. W. 489, the situation was just the reverse of that in the instant case. There, plaintiff originally brought suit against the driver of an automobile and the streetcar company to recover damages for injuries alleged to have been sustained by the joint negligence of the defendants. The driver of the automobile died before the trial, and the suit was dismissed. Thereafter, a new action was begun against the streetcar company alone. Defendant offered in evidence the unverified complaint in the original action. It was received over plaintiff's objection. The court held that it was admissible under the rule laid down in Carpenter v. Tri-State T. & T. Co. 169 Minn. 287, 211 N. W. 463.

In the Carpenter case an automobile accident occurred when the driver of an automobile collided with a telephone pole in a heavy fog. At the invitation of the driver of the automobile, Agnes Carpenter, Louis D. Bernier, and Mrs. Swenfurter were riding with him. Bernier was killed and Mrs. Carpenter was injured. Three actions were begun, one by Mrs. Carpenter to recover for her injuries, one by her husband to recover expenses, and one by Anna Bernier as special administratrix to recover for the death of Bernier. The complaints were not verified and were signed only by counsel. Thereafter, the driver of the automobile died. Subsequent to his death, plaintiffs, by different counsel, brought other actions against the telephone company predicated upon the claim that the prox-

imate cause of the accident was the company's negligence in failing to properly locate the pole with which the automobile collided. Upon the trial, Mrs. Carpenter's testimony exonerating the driver of the automobile was inconsistent with the allegations of the complaints in the first actions brought against him. Defendant offered in evidence her complaint in the first action. It was received over plaintiffs' objection. Mr. Carpenter's complaint in the first action was also received over objection. After the reception of the complaints, undisputed testimony was given to the effect that the two Carpenters had not personally talked to their attorneys before the first actions were begun and that they did not know the contents of their complaints. The trial court granted a new trial on the ground that the complaints were improperly admitted. Our language in reversing the trial court probably is responsible for much of the confusion that seems to exist regarding this question. We said (169 Minn. 289, 211 N. W. 464) :

"A verified pleading is admissible as an admission or for impeachment. Siebert v. Leonard, 21 Minn. 442; Vogel v. D. M. Osborne & Co. 32 Minn. 167, 20 N. W. 129. It may, when the party allows it to remain the pleading in the case, be received in evidence for such purposes even though it is not verified and is signed only by the attorney. Vogel v. D. M. Osborne & Co. supra. When a party has indicated himself dissatisfied with a pleading by substituting a new one, the original pleading, when not verified, can no longer be received in evidence until a foundation therefor is laid. This requires the party offering the evidence to show affirmatively that the pleader authorized or directed the insertion of the particular statement of fact. Vogel v. D. M. Osborne & Co. supra; Salo v. D. & I. R. Rd. Co. 121 Minn. 78, 140 N. W. 188. The reason for this is that the pleader has by such amendment impliedly said that the original was interposed under a mistake as to the facts. These authorities do not sustain respondent's contention. In the absence of such repudiation it is presumed that the statements in a pleading, though not verified, are made with the approval of the

party. As such they are admissible. They are not conclusive, but subject to explanation. As to the Carpenter cases much of the probative value of the pleading was probably destroyed by the explanation given which tended to show that they never knew the contents of the pleading. This went to the weight of the evidence and not to its admission. It rested with the jury to say whether there remained a residuum of probative force. Of course a pleading filed without authority is not admissible. When the objection goes to lack of authority to make the pleading, a question of fact is presented which the trial court must then determine. The burden then is upon the one making the objection to overcome the presumption. But when the relation of attorney and client exists the pleading is to be received in evidence. Counsel is not only the representative of his client but he is an officer of the court. The pleading in question being an authorized one, it comes within the rule of the Vogel case. We know of no case in this state requiring the party offering the pleading in evidence to show affirmatively that the pleader authorized or directed the insertion of the particular statement except where the pleading has been amended. The language of the court in Burns v. Maltby, 43 Minn. 161, 45 N. W. 3, must be regarded as used inadvertently since the authorities cited do not sustain the statement made. To so hold would practically result in excluding all unverified pleadings.

"The pleading in the Agnes Carpenter case was properly received for impeachment purposes and all the complaints in their respective cases were properly received as containing an admission against interest."

In the later case of Hork v. Minneapolis St. Ry. Co. 193 Minn. 366, 369, 258 N. W. 576, 577, we said:

"* * * a pleading in another case, or one superseded by amendment, is out of the record and so not to be used unless offered and received in evidence, sometimes not even then. Vogel v. D. M. Osborne & Co. 32 Minn. 167, 20 N. W. 129. Absence of verification by the party himself is immaterial upon the question of admissibility,

although it may have something to say upon the weight of the pleading as evidence. Carpenter v. Tri-State T. & T. Co. 169 Minn. 287, 211 N. W. 463."

There is no sound reason for admitting a pleading in an action which has been dismissed and denying admission of a pleading that has been amended. The allegations of one are as much an admission as the other. If plaintiff in the instant case had dismissed his original suit against Herseth and Fredsall and commenced a new action against Herseth, Fredsall, Worthley, and the Minneapolis Street Railway Company, obviously the complaint in the first action would be admissible under the Bakkensen case, *supra*. There is no reason why it should not be equally admissible when it is amended so as to accomplish the same purpose. The original complaint alleges that plaintiff's injuries were *solely* the result of the negligence of Herseth and Fredsall. This allegation is inconsistent with his present claim of joint and concurrent negligence on the part of all the defendants now included in the action.

There is much authority on the subject and likewise much confusion in the application of cases. The weight of authority is that an amended pleading, even though unverified, is admissible as an admission or for the purpose of impeachment. 4 Wigmore, Evidence (3 ed.) § 1067; 20 Am. Jur., Evidence, §§ 644, 645; Annotations, 14 A. L. R. 65 and 90 A. L. R. 1402.

The better rule, and that which would lead to the least confusion, is that amended or superseded pleadings are admissible against the party interposing them, even though signed only by counsel, and that it is presumed that an attorney commencing an action has authority to prepare the pleadings. To overcome that presumption, the party against whom the pleading is offered may show that he did not have knowledge of its contents. Such proof will go to the trier of facts as affecting the weight of the evidence, but does not affect its admissibility. There seems to be no good reason for a presumption that an attorney had authority to draw an unverified pleading that remains in the case any more than that

he had authority to draw a pleading that was later amended or superseded. It is not required under our code pleading that a complaint be verified. To hold that an unverified pleading is presumably made by an attorney with the authority and knowledge of his client if it remains in the case, and that such presumption does not prevail if it is amended, simply leads to absurdity. A party should not be permitted to avoid the consequences of charges and statements in a complaint by so simple an expedient as stating categorically that he did not verify the complaint. Whether a complaint is verified or not, the allegations contained therein are statements upon which plaintiff bases a cause of action, and the statements are nonetheless claims on his part against the defendants, and likewise admissions, whether they are verified or not. It may be that where the statements are made under oath they are entitled to greater weight than otherwise, but it should not affect the admissibility of the statements as an admission.

We conclude that the original complaint in this case was admissible as an admission and for impeachment purposes and that it was error to exclude the proof offered, for which there must be a new trial. The allegations in the original complaint are so entirely inconsistent with plaintiff's present claims that if the jury believed that plaintiff's original complaint stated the true version of the accident it would obviously relieve the streetcar company and its motorman from all liability. Under these circumstances, it was highly prejudicial to exclude the offered evidence, which requires a new trial.

■ Appellants also assign as error instructions of the trial court relating to the definition of proximate cause. After giving a substantially correct definition of proximate cause, the court added the following:

"When two or more persons through their negligence cause harm concurrently, then the law is that if their negligence, concurrent negligence, was a material factor or substantial element bearing directly upon the resultant harm, then they are both responsible for

all the harm, loss and damage that ultimately flows and results from that concurrent negligence."

In Seward v. Minneapolis St. Ry. Co. 222 Minn. 454, 457, 25 N. W. (2d) 221, 223, we disapproved of the "material element or substantial factor" theory of proximate cause. The instant case is another illustration of the danger of using this theory in defining proximate cause. The quoted portion of the court's instruction is not a correct definition of proximate cause. It ignores entirely the element of intervening cause, which is important in the present controversy. It is not sufficient to say that elsewhere in the instructions a correct definition of proximate cause is to be found. Following a correct instruction by an incorrect definition would confuse rather than enlighten the jury. In view of the fact that there must be a new trial, nothing more need be said concerning this assignment of error, as the trial court will no doubt guard against a repetition of it.

On the appeal of Robert A. Fredsall, only one question is raised, namely: Was defendant Herseth driving the automobile owned by Robert with the consent, express or implied, of the owner, under M. S. A. 170.54? This section reads:

"Whenever any motor vehicle, after Laws 1945, Chapter 285, becomes effective, shall be operated upon any public street or highway of this state, by any person other than the owner, with the consent of the owner, express or implied, the operator thereof shall in case of accident, be deemed the agent of the owner of such motor vehicle in the operation thereof."

The court held as a matter of law that the negligence of Herseth would be imputed to the owner of the car. In this the court was in error. There is no evidence of any express consent. Implied consent, if it exists at all, must be drawn from all the facts and circumstances existing in the case and is usually a question for the jury. Koski v. Muccilli, 201 Minn. 549, 277 N. W. 229; Steinle v. Beckwith, 198 Minn. 424, 270 N. W. 139; Kerns v. Lewis, 249 Mich. 27, 227 N. W. 727.

On the record as it now stands, it is doubtful whether there is any evidence from which the jury could find implied consent under our former decisions. Krahmer v. Voss, 201 Minn. 272, 276 N. W. 218; Ewer v. Coppe, 199 Minn. 78, 271 N. W. 101; Kayser v. Jungbauer, 217 Minn. 140, 14 N. W. (2d) 337; Abbey v. Northern States Power Co. 199 Minn. 41, 271 N. W. 122.

■ The trial court and counsel for plaintiff seem to have proceeded upon the theory that consent was established as a matter of law. Inasmuch as there must be a new trial against defendant streetcar company and there is a probability that the evidence of implied consent may be stronger on another trial if counsel and the court proceed upon the correct theory, we feel that in the interests of justice a new trial should be granted against all parties rather than to grant judgment notwithstanding the verdict in favor of defendant Fredsall. In passing upon a motion for a new trial on the ground that the verdict is not justified by the evidence, the court may properly take into consideration the probability that on another trial stronger evidence will be adduced. 5 Dunnell, Dig. § 7143; Cruikshank v. St. Paul F. & M. Ins. Co. 75 Minn. 266, 77 N. W. 958; Kreatz v. St. Cloud School Dist. 79 Minn. 14, 81 N. W. 533; Farmers State Bank v. Merchants & M. State Bank, 164 Minn. 300, 204 N. W. 965.

Reversed and new trial granted as to all parties.

LORING, CHIEF JUSTICE (dissenting).

I find myself in disagreement with the views of the majority in two respects: First, as to the holding that there was a question for the jury as to whether the consent by Robert Fredsall to his brother Roger was broad enough to authorize the lending of the car by Roger to a third person; second, as to the question of whether the action of Worthley, the motorman, whether negligent or not, was connected as cause with the injury to plaintiff.

On the first question, the family-car doctrine is merged in and superseded by M. S. A. 170.54 of chapter 170, known as the safety responsibility act. Jacobsen v. Dailey, 228 Minn. 201, 36 N. W.

(2d) 711; Ellingboe v. Guerin, 228 Minn. 211, 36 N. W. (2d) 598. The liability of Fredsall depends entirely upon the scope of his consent or permission to Roger Fredsall to use the car. As I view the record, the evidence was conclusive that the consent did not so authorize the loan of the car. I regard the record as so completely covering the transaction by all participants that there can be no reasonable expectation that further proof could be offered which would make a case for the jury. Every witness who could know anything about the scope of the consent was called, examined, and thoroughly cross-examined about the tenor of consent. Therefore, judgment in favor of Robert should be ordered.

If we are not to overrule an entire line of decisions by this court, it seems to me that these conclusions are inescapable for the following reasons: There is no evidence of any express consent. The burden of proof as to the existence of implied consent was on plaintiff.[2] He failed to establish that Herseth's use of the automobile was within the scope of the consent which Robert or his wife had given to Roger.

The tenor of the conversations between Roger and Robert's wife excludes any basis for an inference that there was implied consent. The consent was originally given to Roger to use the car in order to pick up his sister at the railroad station. The conversation between Robert and Roger confined permission to use the car to Roger's own use, although nothing was said specifically to the effect that he should not lend the car to someone else. Neither was there anything said on which an implied consent to lend the car could be based. In spite of the ingenuity of counsel for plaintiff in endeavoring to get Robert, his wife, or Roger to testify that the consent permitted Roger to lend the car, their testimony was that Robert's consent went no further than to tell Roger he "could use the car." His wife, Evelyn, said, when she extended the permission, that it was "for his own pleasure." When counsel inquired if that "could include business," she answered, "He didn't mention busi-

[2] M. S. A. 170.54. Cf. Abbey v. Northern States Power Co. 199 Minn. 41, 271 N. W. 122; Kayser v. Jungbauer, 217 Minn. 140, 14 N. W. (2d) 337.

ness to me. He mentioned pleasure." The accident occurred at 12:10 the following morning while the car was being used on the business of Roger's fraternity.

It is suggested that the evidence indicating that Roger had permitted fraternity brothers to use other automobiles belonging to his family tended to show implied consent by Robert that the car could be used by others on fraternity business, but Roger's testimony by deposition relates exclusively to the use by others at the fraternity of cars which he had borrowed from his parents or from his sister. The occasion on which the injury to plaintiff occurred was the first and only occasion when Roger had borrowed Robert's car. Robert went into the navy in 1941 and married while in the service. He was in the service until November 1945, about one month prior to lending his car to Roger. He and his wife had lived at various places while he was in the navy. They had had the car with them since 1944. When the couple returned to Minneapolis, they went to live immediately in a residence apart from Robert's parents. There was not a syllable of evidence indicating that Robert knew of any occasion when Roger had lent a borrowed car. There is direct evidence to the contrary.[3]

Under our previous decisions, the use of other family cars by Roger in fraternity business, without knowledge by Robert of such use, could not properly be submitted to the jury as implying a consent to lend Robert's car to John Herseth. Krahmer v. Voss, 201 Minn. 272, 276 N. W. 218; Ewer v. Coppe, 199 Minn. 78, 271 N. W. 101. Therefore, there should be judgment for Robert notwithstanding the verdict against him. This is a stronger case for direction of a verdict than was Kayser v. Jungbauer, 217 Minn. 140, 14 N. W.

---

[3]"Q. Did you have any knowledge before December 21st, 1945, that he had on occasion let other members of the fraternity use the automobile he might be driving?

"Mr. Lilly: On the part of the defendant Fredsall I object as incompetent, irrelevant, immaterial.

"The Court: Overruled.

"Mr. Lilly: Exception.

"The Witness: No, I didn't know that."

(2d) 337, or Krahmer v. Voss, *supra,* where we held, as a matter of law, that the use was not within the scope of the consent. See, also, Abbey v. Northern States Power Co. 199 Minn. 41, 271 N. W. 122; Ewer v. Coppe, 199 Minn. 78, 271 N. W. 101.

In Kayser v. Jungbauer, 217 Minn. 140, 143, 14 N. W. (2d) 337, 339, plaintiff was severely injured by a car owned by defendant Jungbauer when it was backed into plaintiff at a filling station. The trial court granted a directed verdict for owner Jungbauer, which on appeal was affirmed. This court said:

"Nor is there any evidence to support the contention that Seymour drove the car with the implied consent of Jungbauer, the owner, so as to fix liability upon the latter for the negligence of the former. Howard Jungbauer had driven the car to the Kowalska-Johnson station and turned it over to them for servicing. Howard was in the station settling his account when Seymour volunteered to move the car. Howard did not give Seymour express permission to move the car. It is true that on three other occasions such express permission was given by Howard, and Seymour did drive the car when Howard was along. But previous use of a car with express consent cannot be construed as evidence of implied consent at a subsequent time. Krahmer v. Voss, 201 Minn. 272, 276 N. W. 218. The trial court was right in directing a verdict for Jungbauer."

In Krahmer v. Voss, 201 Minn. 272, 276 N. W. 218, a recovery was sought for wrongful death. The car in which decedent was riding was owned by defendants Voss and Koch, who were partners in a garage business. It was driven by one Richter, who, plaintiff claimed, was driving with the consent of Voss and Koch. The evidence showed that Richter had permission to use the car to make a brief visit, but he was to return it before dark. He did so and then took it again in the evening when preparing to go to a dance. Plaintiff argued that because use of the car was given on one occasion with express consent there was evidence of implied consent to use it for the same or other purposes at a subsequent time. This court held to the contrary (201 Minn. 275, 276 N. W. 219):

"* * * it cannot be implied from the fact that Richter had defendants' consent to use the car during the day for the specific purpose of taking his parents on a visit that he thereby had consent to use the car for the entirely unrelated purpose to which it was put on the evening in question. The authority to use it for the one purpose was not authority to use it for the other. See Abbey v. Northern States Power Co. 199 Minn. 41, 271 N. W. 122. So even if it were conceded that at the time the accident occurred it was not so dark that the car was being driven at a forbidden time, or outside the time limits prescribed by the defendants, it was being used for a purpose to which they had in no way consented."

The facts of the present case show an even more remote relationship in time, source of consent, and purpose of use than the facts of the preceding cases. In Abbey v. Northern States Power Co. 199 Minn. 41, 271 N. W. 122, plaintiff was injured by being thrown from a truck belonging to defendant, Northern States Power Company, when it was driven by one Mott. Mott was a part-time employe of defendant assigned to a specific wire-moving job which had been completed by the end of the morning. After lunch, the truck, which was in the possession of another employe, was left standing in front of the job. Mott drove it to get some equipment as a favor for a contractor in the house-moving operation. Plaintiff, an employe of the contractor, was injured when thrown from the back of the truck. The question was whether, under the Minnesota financial responsibility act, the implied consent to use the truck during working hours could be extended to the use of the truck for the convenience of another and after completion of his job. On appeal this court said (199 Minn. 43, 271 N. W. 123):

"* * * The evidence does not justify an inference of implied consent to use the car for any personal purpose of Mott's. *Nor does it justify an implied consent for Mott to use it in connection with any other person's business.* Had Mott taken the car to go on a fishing expedition of his own it is quite obvious that it would not

be within the consent implied from the circumstances presented by this record. *It also seems to us that it is just as obvious that he had no right or implied consent to use the truck in the furtherance of any other person's business.* For instance, had Mott taken the car and gone to some other town to get Henke's equipment, it would seem quite obvious that it was far beyond any proper inference of implied consent." (Italics supplied.)

Thus, in the present case, as a matter of law, the use by a third person in the business of yet other persons was beyond any proper inference of implied consent. As in the Abbey case, the implied consent or permission here is coextensive with the time and nature of Roger's permission from Robert or his wife, and no further.

In Ewer v. Coppe, 199 Minn. 78, 271 N. W. 101, the court in reversing an order denying a new trial held that evidence did not sustain verdicts that the car which caused injury to plaintiffs was being driven with the express or implied consent of the owners. Previous use of the car by the employe was with express consent of the owner and could not be construed as evidence of previous implied consent.

I am, therefore, in disagreement with that part of the majority opinion which would send the case back for a new trial as to defendant Robert A. Fredsall on the theory that more evidence might be produced on the question of implied consent. There seems no possibility that at another trial stronger evidence could be produced on that issue. All the witnesses who had any connection with the matter or could have any knowledge of it have testified in the original trial. Their testimony was clear and unequivocal. They were thoroughly and shrewdly cross-examined. Their testimony was not weakened thereby. There was no motion for a new trial on the ground of newly discovered evidence, nor does the record suggest that it could be produced.

Where there is both a motion for judgment notwithstanding the verdict or for a new trial and both are denied, this court may affirm, reverse with directions to order judgment, or grant a new trial. Where, as in this case, there is no probability that the deficiency in

proof will be supplied by a new trial, this court should direct judgment notwithstanding the verdict.[4]

On the second question—the negligence of the motorman—the record seems conclusive that, even if it could be said that there was negligence on his part, it was completely insulated by the intervening negligence of Herseth. There may have been a question for the jury as to whether Worthley lingered at the point on the north side of Thirty-eighth street, where[5] he at least slowed down to observe traffic. At the time he made his observation Herseth was at least 250 feet away. That being the case, Herseth was not within the zone of immediate hazard and did not have the right of way over Worthley. A Minneapolis ordinance[6] makes it unlawful to travel faster than 25 miles per hour at night. If Herseth traveled 250

[4]Merritt v. G. N. Ry. Co. 81 Minn. 496, 84 N. W. 321; Diddams v. Empire Milking Mach. Co. Inc. 185 Minn. 270, 240 N. W. 895; cf. In re Estate of Marsden, 217 Minn. 1, 13 N. W. (2d) 765; First Nat. Bank v. Fox, 191 Minn. 318, 254 N. W. 8 (citing many other cases). See, Drake v. Connolly, 183 Minn. 89, 235 N. W. 614; 3 Dunnell, Dig. & Supp. § 5086.

[5]M. S. A. 169.20, subd. 3: "The driver of a vehicle shall stop as required by this chapter at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the intersection from the through highway or which are approaching so closely on the through highway as to constitute an immediate hazard, but the driver having so yielded may proceed, and the drivers of all other vehicles approaching the intersection on the through highway shall yield the right of way to the vehicles so proceeding into or across the through highway.

"The driver of a vehicle shall likewise stop in obedience to a stop sign, as required herein, at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway, and shall proceed cautiously, yielding to vehicles not so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed."

[6]67 Council Proceedings Minneapolis 637, adopted by letter June 5, 1942, by Hoffmann, State Commr. of Highways; see, M. S. A. 169.14, subds. 2 and 5.

"* * * provided that the maximum speed on streets not otherwise zoned shall be thirty (30) miles per hour in the daytime and twenty-five (25) miles per hour in the nighttime. The words daytime and nighttime as used herein shall be defined as provided by Section 2720-18-178, b.3, Masons

feet while Worthley was traveling 37 feet at 10 miles an hour, he was traveling at an unlawful speed and forfeited his right of way.[7] He was bound to slow down so that Worthley might pass. § 169.20, subd. 3.[8] Had Worthley at that time continued across Thirty-eighth street, as some witnesses assert that he did, he would have had abundant time to travel the 32 or 37 feet while Herseth was traveling the 250 feet. There was some evidence from which the inference could be drawn that Worthley lingered in starting across Thirty-eighth street in such manner that Herseth might have interpreted his action as an invitation to pass in front of him.

In Flom v. St. Paul City Ry. Co. 218 Minn. 474, 16 N. W. (2d) 551,[9] the facts are quite similar to those here. In that case, plaintiff

Minnesota Statutes 1927, 1940 Supplement. Any speed in excess of the limits established and provided by this section shall be unlawful."

Although the recital of facts indicates that Herseth was driving from 20 to 45 miles per hour, the testimony of witnesses other than Herseth shows that he was driving more than 25 miles per hour and, indeed, on examination Herseth conceded that he was approaching the intersection and was driving into the intersection at a speed of more than 25 miles per hour.

[7]M. S. A. 169.20, subd. 1: "The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection from a different highway.

"When two vehicles enter an intersection from different highways at approximately the same time the driver of the vehicle on the left shall yield the right of way to the vehicle on the right.

"The foregoing rules are modified at through highways, and otherwise as hereinafter stated in this section.

"The driver of any vehicle or street car traveling at an unlawful speed shall forfeit any right of way which he might otherwise have hereunder."

[8]"The driver of a vehicle shall stop as required * * *, and the drivers of all other vehicles approaching the intersection on the through highway shall yield the right of way to the vehicles so proceeding into or across the through highway."

[9]Cf. also, Moore v. Kujath, 225 Minn. 107, 29 N. W. (2d) 883, 175 A. L. R. 1007, where this court held that defendant was negligent as a matter of law in failing to see a car coming up to an unmarked intersection 100 feet away and in controlling his car so as to avoid a collision, under 169.20, subd. 1.

was driving his automobile south on Western avenue, which is a through street in St. Paul. Defendant was operating a streetcar on Thomas street, which intersects Western avenue at right angles. The streetcar was stopped in obedience to stop signs at the intersection and also to discharge passengers. It then started to cross Western avenue when plaintiff was over 100 feet from the track and approaching it. The automobile struck the streetcar. In affirming a directed verdict for defendant, this court applied § 169.20, subd. 3, and said (218 Minn. 476, 16 N. W. [2d] 552):

"* * * We think the evidence is conclusive that the streetcar had lawfully entered the intersection of Western avenue when plaintiff Flom was something over 100 feet north of the north rail of defendants' streetcar track. In fact, Flom was driving at a speed of about five times that of the streetcar. The woman crossing Western avenue on foot along with the streetcar jumped back when Flom came so near that she realized a collision was imminent. Whether to protect their eyes or to avoid seeing the crash, this woman and one of those on the streetcar closed their eyes when the impact came. The evidence is such that if the jury had returned verdicts for plaintiffs the court would have been compelled to set them aside and grant judgment for defendants notwithstanding the verdicts."

Had Herseth struck the streetcar and had the action been between the driver or occupants of the two vehicles, the facts and circumstances of the two cases would be almost identical, except that in the instant case the automobile was farther away when the streetcar entered the intersection.

The majority are holding in effect that the streetcar company is responsible for Herseth's negligence subsequent to his passing the streetcar. Even if Worthley had been negligent, in my opinion, his action was completely "insulated" as a cause by the subsequent negligence of Herseth and the five-foot extension of the curb. There was nothing in the situation at the time the automobile crossed in front of the streetcar that might lead the motorman to believe that

Herseth would not keep a proper lookout, nor is there any evidence that the motorman was aware of the protrusion of the curb line of Bryant avenue into Thirty-eighth street or that he saw plaintiff. The streetcar was stopped or passed by Herseth at a point which left ample room for him to drive in front of it, and he did pass it safely. After passing it, he obviously failed to observe what, in the exercise of ordinary care, he ought to have observed, namely, the abrupt extension of the southerly curb into Thirty-eighth street— a distance of five feet farther than the curb on the west side of the street. It was this extension of the curb, coupled with Herseth's failure to observe it or plaintiff, who stood 13 to 15 feet east of it, that was the superseding, intervening proximate cause of the accident which resulted in plaintiff's injuries. Herseth's negligence insulated the action of the motorman, whether negligent or not. After passing the streetcar, Herseth had at least half the width of Bryant avenue in which to maneuver and avoid the projecting curb, plus 13 to 15 feet more in which to see plaintiff, who was standing on the sidewalk behind the curb and 13 to 15 feet east from the Bryant avenue curb line. Altogether, he had over 30 feet, after passing the streetcar, in which to avoid hitting plaintiff. At the rate he and his passenger assert they were going, this was ample space within which to avoid the curb and plaintiff. A slight touch on the steering wheel would have veered the car a foot and a half to the left and clear of the curb. Instead of that, Herseth swung the car farther to the right after passing the streetcar. He simply failed to see what, in the exercise of ordinary care, he should have seen. Although he passed the front of the streetcar in complete safety, he admitted keeping a view of it "out of the corner of my eye." He could not do that and at the same time maintain a proper lookout ahead. He also admitted turning more to the right. Once Herseth had passed, there was nothing the motorman could have done to prevent the accident, even if he had been aware of the protruding curb or the presence of plaintiff. Certainly, he could not anticipate that

Herseth would swing farther to the right. Therefore, the motorman's actions were "insulated" by Herseth's negligence and became a mere "occasion or condition," but not a proximate cause, of plaintiff's injuries. Geisen v. Luce, 185 Minn. 479, 242 N. W. 8.

In Beatty v. Dunn, 103 Vt. 340, 343, 154 A. 770, 772, where a question similar to that at bar (except that the negligence of defendant was conceded) was under consideration, the court said:

"* * * But when that danger has been met and overcome, so that there is nothing more to be done to avoid it or its logical consequences, the force set in motion by the defendant's act has spent itself, and there is no causal connection between it and what may follow. In such a case, the dangerous situation created by the defendant's fault ceases to be the cause and becomes the occasion, merely, of subsequent injurious consequences."

In Medved v. Doolittle, 220 Minn. 352, 19 N. W. (2d) 788, this court, speaking through Mr. Justice Peterson, held that the conduct of a motorist who, while driving on a three-lane highway in broad daylight, first saw defendant's parked truck in the motorist's lane a quarter of a mile away and did nothing about it constituted a superseding, intervening cause "insulating" the prior negligence of defendant in parking the truck in violation of a statute which required flags. The intervening negligence, coupled with the motorist's acts when 175 feet away, in turning to look at his wife asleep in the front seat and so looking when the collision occurred, precluded the motorist's recovery for his wife's wrongful death, citing Restatement, Torts, § 447(c).[10]

[10] A defendant is not liable for the results of unforeseeable results of extraordinary forms of negligent conduct, including the reckless or unusual driving of vehicles. Cf. e. g., Meyette v. C. P. Ry. Co. 100 Vt. 345, 6 A. (2d) 33; Butner v. Spease, 217 N. C. 82, 6 S. E. (2d) 808 (citing many cases); Hendricks v. Pyramid Motor Freight Corp. 328 Pa. 570, 195 A. 907; DeCamp v. Sioux City, 74 Iowa 392, 37 N. W. 971. See, Prosser, Torts, 365-366.

In the application of the rules of intervening cause, courts will consider whether the injury produced was a normal part of the risk produced.

From these decisions, two principles can be extracted which are applicable to the instant case. First, we ought not impose liability where the effects of defendant's negligence are logically and causally unrelated to the harm to plaintiff because of intervention of unusual continued negligence or unlawful acts of another. In such a situation, defendant's fault ceases to be the cause and becomes an occasion merely of the subsequent injurious consequences. Second, in determining whether a causal relation exists for purposes of affixing liability in cases involving an intervening cause, we should consider the reasonable foreseeability that defendant's conduct would combine with negligent acts of others to produce the harm, as well as the foreseeability of the result itself.[11]

In the case at bar, Herseth admits that his lights were good. It must be conceded that had he looked ahead he would have seen the curb and plaintiff. His negligence is clear as a matter of law. The jury found against him. He has not appealed.

Of course, it was error to exclude from the evidence the original complaint in the action. I concur with the decision of the majority on this point, but I think there should be judgment notwithstanding the verdict in favor of Robert A. Fredsall and the Minneapolis Street Railway Company.

Cf. Salt River Valley Water Users' Assn. v. Cornum, 49 Ariz. 1, 63 P. (2d) 639; La Londe v. Peake, 82 Minn. 124, 84 N. W. 726; Hansen v. St. Paul Gaslight Co. 82 Minn. 84, 87, 84 N. W. 727, 728; Paquin v. Wisconsin Central Ry. Co. 99 Minn. 170, 175, 108 N. W. 882, 884; Neidhardt v. City of Minneapolis, 112 Minn. 149, 127 N. W. 484, 29 L.R.A.(N.S.) 822 (semble); Lundstrom v. Giacomo, 194 Minn. 624, 261 N. W. 465; Johnson v. Sunshine Creamery Co. 200 Minn. 428, 435, 274 N. W. 404, 407. Cf. also, Phillips v. Dickerson, 85 Ill. 11, 16, 28 Am. R. 607, 609; but cf. McDowell v. Village of Preston, 104 Minn. 263, 266, 116 N. W. 470, 471, 18 L.R.A.(N.S.) 190. See, Hoag v. Lake Shore & M. S. R. Co. 85 Pa. 293, 298, 27 Am. R. 653; Pennsylvania R. Co. v. Hope, 80 Pa. 373, 378, 21 Am. R. 100; 16 Am. & Eng. Enc. of Law 436, note 4; 2 Thompson, Negligence, 1085; Shearman & Redfield, Negligence, § 739; 38 Am. Jur., Negligence, § 72; Restatement, Torts, § 433(b). Many of these cases have their origin in M. & St. P. Ry. Co. v. Kellogg, 94 U. S. 469, 475, 24 L. ed. 256, 259.

[11]See, Prosser, Torts, 365-367. Restatement, Torts, § 433(b).

MAGNEY, JUSTICE (dissenting).
I concur in the dissent of Mr. Chief Justice Loring.

MATSON, JUSTICE (dissenting).
I concur in the dissent of the Chief Justice.

