**Norman WARTNICK, Petitioner, Appellant,**

v.

**MOSS & BARNETT, et al., Respondents.**

**No. C6–91–564.**

Supreme Court of Minnesota.

Oct. 2, 1992.

Rehearing Denied Dec. 9, 1992.

---

Jerry W. Snider, Steven L. Severson, Faegre & Benson, and Joseph S. Friedberg, Minneapolis, for appellant.

John M. Mason, Peggy L. Hicks, Dorsey & Whitney, Minneapolis, for respondents.

GARDEBRING, Justice.

This case arises out of a malpractice action filed by Norman Wartnick against his attorney Phillip Gainsley and Gainsley's law firm Moss & Barnett. After Norman Wartnick's former employee and recent competitor Robert Nachtsheim, Sr. (the decedent) was murdered in May 1973, Wartnick retained Gainsley as counsel during the police investigation. Gainsley also advised and assisted Wartnick in recovering the proceeds of a life insurance policy Wartnick's company, Midwest Florist Supply Company (Midwest), had held on the decedent. Gainsley continued to represent Wartnick after Betty Nachtsheim (Nachtsheim), the decedent's widow, sued Wartnick and Midwest for unjust enrichment. Nachtsheim's suit was later consolidated with a wrongful death suit against Wartnick alone.

Gainsley represented Wartnick at the trial of the consolidated actions, in which the jury awarded Nachtsheim $350,000 in damages and $2,000,000 in punitive damages on the wrongful death action. The unjust enrichment action was dismissed. Gainsley also represented Wartnick in his appeal to the court of appeals in which the jury's verdict was affirmed.

In January 1988, Wartnick filed this malpractice action against Gainsley, charging Gainsley with several counts of malpractice. In two separate summary judgment proceedings, all the counts were dismissed. Wartnick appealed, and the court of appeals affirmed in *Wartnick v. Moss & Barnett*, 476 N.W.2d 166 (Minn.App.1991). This appeal followed.

The underlying facts of this matter are as follows: Norman Wartnick was a shareholder and officer of Midwest, where the decedent was a salesperson between 1959 and 1972. In 1970, Wartnick purchased from Prudential Life Insurance Company (Prudential) a $100,000 "key man" life insurance policy on the decedent's life, with Midwest as the named beneficiary. The decedent left Midwest's employ in August 1972, and started a competing business. On May 11, 1973, Wartnick paid the annual life insurance premium on the policy to keep it in effect, despite the fact that the decedent was no longer an employee of Midwest. On May 24, 1973, the decedent was shot in the head at close range, shortly after he arrived for work. No one was ever charged with the murder.

After the decedent's death, Wartnick retained Gainsley to represent him and Midwest in connection with the claim for the life insurance proceeds. Gainsley also represented Wartnick in the on-going police investigation of the murder, advising him not to take a lie detector test, and recommending that Wartnick hire a criminal lawyer to assist Gainsley. Prudential also investigated the murder and, after receiving notice that the Hennepin County Attorney's office would not be indicting Wart-

nick, paid the life insurance policy proceeds to Midwest.

Nachtsheim hired an attorney to represent her in a suit to obtain the insurance proceeds from Wartnick and Midwest. She also wanted to sue Wartnick for wrongful death, because she believed that her husband had been killed for the insurance proceeds. Her attorney was reluctant to bring a suit for wrongful death with so little evidence, and inadvertently let the wrongful death statute of limitations expire before bringing suit. The attorney did, however, file a claim for unjust enrichment against Wartnick and Midwest in 1976.

During the discovery period of this civil suit, Wartnick was deposed. Gainsley and Wartnick have different accounts of the preparation and decisionmaking that took place prior to the deposition. Gainsley asserts that he researched the ramifications of having Wartnick plead the fifth amendment in response to any questions about the murder of the decedent. Gainsley also reports discussing the issue with other lawyers at his firm, and discussing it with Wartnick in "numerous phone conversations," and at a meeting several days before the deposition. Gainsley asserts that Wartnick made an informed decision to take Gainsley's advice and plead the fifth.

Wartnick does not remember meeting with Gainsley prior to the deposition, or receiving any information about the possible negative consequences of pleading the fifth. The only meeting or conversation he remembers regarding the decision to plead the fifth was a meeting in the men's room immediately prior to the deposition. There, according to Wartnick, Gainsley advised him to respond to any questions about the decedent's murder by asserting his fifth amendment privilege against self-incrimination. He gave Wartnick a card to read at the appropriate times. Wartnick followed Gainsley's advice.

Furnished with Wartnick's unresponsive answers in the deposition[1], Nachtsheim's attorney proceeded to lobby the legislature to amend the wrongful death statute to remove any limitations period for actions to recover damages for "a death caused by an intentional act constituting murder." The attorney drafted and promoted this change as a victim's rights bill. After two unsuccessful attempts, and continued lobbying by the attorney, the bill passed. The amendment applied to "any death or cause of action arising prior to its enactment which resulted from an intentional act constituting murder." 1983 Minn.Laws c. 347 § 3 subd. 4.

No longer barred by the statute of limitations, Nachtsheim promptly brought a wrongful death action against Wartnick. The unjust enrichment and wrongful death actions were consolidated by stipulation. Prudential, a party in the unjust enrichment suit, settled with Nachtsheim prior to trial. While preparing for the case, Gainsley offered Wartnick for another deposition if opposing counsel would agree not to use the first one. Nachtsheim's attorney refused. Gainsley relied principally on the police file and a deposition of Nachtsheim to gather information about the decedent's murder and construct a defense.

In his opening arguments at trial, Gainsley revealed that although Wartnick had been asked to take a polygraph examination regarding the murder, and was willing, Gainsley had advised against it. Because of his lack of an independent investigation and his reliance on the police reports, dur-

1. The United States Supreme Court has held that the fifth amendment allows an adverse inference to be drawn by the jury in a civil case where a party invokes the fifth amendment privilege against self incrimination. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). In Minnesota, the rule is also that a jury may draw such an adverse inference in a civil case. *See Ralph Hegman Co. v. Transamerica Ins. Co.*, 293 Minn. 323, 198 N.W.2d 555, 557 (1972). In *Parker v. Hennepin County Dist. Ct.*, 285 N.W.2d 81 (Minn.1979) this court upheld a court order that deemed allegations in a request for admission admitted after the defendants refused to cooperate in a deposition and refused the request by claiming their fifth amendment privilege. *Id.* at 82. In the instant case, after the statute of limitations was amended, it appears that the finder of fact's ability to make an adverse inference on the basis of Wartnick's answers in the deposition may have helped the case go to the jury.

ing the trial Gainsley had some difficulty getting information into the record. Wartnick's responses in the deposition were read to the jury, and Wartnick testified at the trial. After being instructed that it could draw an adverse inference from Wartnick's fifth amendment assertions in the deposition, the jury found Wartnick had murdered or caused the murder of the decedent. However, the unjust enrichment claim was dismissed because the jury found for Midwest.

In his action against Gainsley, Wartnick asserts five counts of malpractice. These counts, as summarized in Wartnick's brief, are:

1) Instructing Wartnick to assert the Fifth Amendment privilege at his deposition without understanding the legal ramifications of that instruction;

2) Failing to permit Wartnick to make his own informed decision whether to assert the Fifth Amendment privilege;

3) Injecting inadmissible and highly prejudicial evidence into the trial by advising the jury in opening statement that Wartnick had refused to take a polygraph test when requested to do so by the police lieutenant investigating the Nachtsheim murder;

4) Failing to conduct a minimum adequate investigation into the Nachtsheim murder, including failing to interview and depose key witnesses and suspects in the murder;

5) Failing to mitigate the damage caused by his Fifth Amendment instruction by not offering Wartnick unconditionally for a second deposition * * *.

In support of his motion for summary judgment, Gainsley provided deposition testimony of two experts. One of them testified regarding all five malpractice counts, concluding that Gainsley's actions in representing Wartnick were not negligent. The other testified regarding Gainsley's introduction of the polygraph issue in the opening statement, stating that raising the issue himself was in accord with good trial practice. Wartnick provided deposition testimony of five experts, all of whom testified regarding the fifth amendment and

polygraph issues, and all of whom believe that Gainsley's actions were negligent. Four of Wartnick's five experts testified on the failure to investigate and failure to mitigate counts, believing that Gainsley's conduct was negligent.

■ The role of this court in reviewing a trial court's grant of summary judgment is to determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *Offerdahl v. Univ. of Minnesota Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). In making this determination, the evidence must be viewed in a light most favorable to Wartnick, the party against whom summary judgment was granted. *See Grondahl v. Bulluck,* 318 N.W.2d 240, 242 (Minn.1982). Any doubts as to whether an issue of material fact exists should also be resolved in favor of Wartnick. *See Rathbun v. W.T. Grant Co.,* 300 Minn. 223, 230, 219 N.W.2d 641, 646 (1974).

■ Wartnick claims that but for Gainsley's allegedly negligent actions, he would have prevailed in his defense of the wrongful death suit. To establish a malpractice claim, Wartnick must prove four elements: (1) that an attorney-client relationship existed between Gainsley and Wartnick; (2) that Gainsley acted negligently or in breach of contract; (3) that Gainsley's acts were the proximate cause of Wartnick's damages; and (4) that but for Gainsley's conduct Wartnick would have been successful in his defense of the wrongful death claim. *See Togstad v. Vesely, Otto, Miller & Keefe,* 291 N.W.2d 686, 692 (Minn.1980). Gainsley agrees that an attorney-client relationship existed, but challenges the remaining three elements.

■ To prove that Gainsley acted negligently, Wartnick must demonstrate a standard of care and show that Gainsley did not meet it. *Prawer v. Essling,* 282 N.W.2d 493, 495 (Minn.1979). "An attorney is only bound to exercise that degree of care and skill that is reasonable under the circumstances, considering the nature of the undertaking." *Id.* (citing *Sjobeck v. Leach,* 213 Minn. 360, 365, 6 N.W.2d 819, 822

(1942)). An attorney's error in judgment will not create liability if it is "within the bounds of an honest exercise of professional judgment." *Cook v. Connolly*, 366 N.W.2d 287, 292 (Minn.1985). However, this court has qualified the "honest error in judgment" language, stressing that a professional must use reasonable care to obtain the information needed to exercise his or her professional judgment, and failure to use such reasonable care would be negligence, even if done in good faith. *See Ouellette v. Subak*, 391 N.W.2d 810, 816 (Minn.1986) (medical malpractice).

■ The first two malpractice counts concern Gainsley's advice to Wartnick prior to the deposition taken on February 16, 1979, during discovery in the unjust enrichment action. The record suggests the existence of questions of material fact as to Gainsley's understanding of the ramifications of his fifth amendment advice, the nature of Wartnick's informed decision on the fifth amendment privilege, and the applicable standard of care for attorneys in advising clients faced with the threats of both civil liability and possible criminal prosecution.

However, even if Gainsley was negligent in the delivery of legal services, Wartnick's malpractice claims may still be barred if Gainsley's advice was not the proximate cause of Wartnick's damages. This court has defined proximate cause as follows:

> For negligence to be the proximate cause of an injury, it must appear that if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others, then he is liable for any injury proximately resulting from it, even though he could not have anticipated the particular injury which did happen.

*Ponticas v. K.M.S. Investments*, 331 N.W.2d 907, 915 (Minn.1983). While the general rule is that a negligent actor is responsible for all injuries which proximately result from a negligent action, there is an exception: the doctrine of superseding cause. The doctrine of superseding cause recognizes that although an actor's negligent actions may have put the plaintiff in the position to be injured, and therefore contributed to the injury, the actual injury may have been caused by an intervening event. That intervention prevents the original negligent actor from being liable for the final injury. *See* Restatement (Second) of Torts [hereinafter Restatement] § 440 (1965).

The trial court and the court of appeals concluded, and Gainsley now argues, that the action by the legislature in creating a cause of action which did not even exist at the time of deposition was a superseding cause which vitiates any liability associated with the allegedly negligent advice on the fifth amendment issue. In essence, Gainsley argues, in the words of the trial court, that "the legislative enactment intervened not to insulate the original negligent person, but rather to create a basis for liability that did not otherwise exist."

For an intervening cause to be considered a superseding cause, the intervening cause must satisfy four elements:

> (1) Its harmful effects must have occurred after the original negligence; (2) it must not have been brought about by the original negligence; (3) it must actively work to bring about a result which would not otherwise have followed from the original negligence; and (4) it must not have been reasonably foreseeable by the original wrongdoer.

*Rieger v. Zackoski*, 321 N.W.2d 16, 21 (Minn.1982) (quoting *Kroeger v. Lee*, 270 Minn. 75, 78, 132 N.W.2d 727, 729–30 (1965)). Unless all four elements are satisfied, an intervening cause cannot be considered superseding. *See Rieger*, 321 N.W.2d at 21.

We conclude that the first element is satisfied because Gainsley's advice was taken and given in 1979 and the statute's amendment and its harmful effects came after the advice was given. We also find that the second element is satisfied, because the statute's amendment was not "brought about" by the advice. Wartnick argues that the advice did indeed bring about the statute's amendment, since Nachtsheim's attorney, armed with Wartnick's responses in the deposition, drafted the

statute's amendment and actively lobbied for its passage in the legislature. However, analysis of this element suggests that in this case the connection between the act and the intervening cause is not sufficient to meet the test.

This court earlier held that an intervening cause which is "a normal response to the stimulus of a situation created by [the original] negligence * * * " will not be considered a superseding cause such that it relieves the original negligent actor. *Carlson v. Fredsall*, 228 Minn. 461, 467, 37 N.W.2d 744, 748 (1949). More recently, we held that where an intervening event was "a normal, foreseeable consequence" of the original act, the subsequent act was not a superseding intervening cause as a matter of law. *State v. Olson*, 435 N.W.2d 530, 534 (Minn.1989). The Restatement states it another way:

> The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about.

Restatement (Second) of Torts § 443 (1965).

> It is not necessary that [a subsequent act] which is done by * * * a third person be "reasonable"; * * *. It is enough that the [subsequent] act is a normal consequence of the situation created by the [original] actor's negligence * * *.

Restatement (Second) of Torts § 443 comment a (1965).

The issue thus becomes whether a change in the wrongful death statute is a "normal response" to Gainsley's advice and Wartnick's answers at the deposition. We conclude that it is not. First, Wartnick hardly maintained a unique position by pleading the fifth amendment to questions regarding his role in a serious felony. It is extraordinary that a change in the law would result from pleading the fifth amendment in a deposition. Second, the legislative action to amend the statute was

only indirectly related to Gainsley's advice. While the deposition testimony may have provided incentive for Nachtsheim's attorney to seek a change in the wrongful death statute, the legislative process is exceedingly complex; it is subject to a variety of pressures and forces that are totally outside the power of a lobbyist alone to impact. Consequently, we hold that the change in the statute of limitations cannot be said to be a normal consequence of the advice and subsequent testimony.

The third element will be satisfied if the intervening cause actively works to bring about a result different from that which would have followed from the original negligence. Wartnick argues that the statute's amendment worked to bring about the very same result which Gainsley's alleged negligence brought about: a costly adverse verdict in a civil action. Whether this element is satisfied will depend on the definition of "result." The Restatement calls for an examination of whether:

> (a) the * * * intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence.

Restatement (Second) of Torts, § 442(a) (1965). The issue could be stated as follows: Whether the extension of the statute of limitations for the wrongful death statute brought about a result "different in kind" from that which would have come about from Gainsley's advice alone. By framing the ultimate outcome in terms of pecuniary damage resulting from civil liability, Wartnick has chosen to construe the "result" very broadly. We believe the resulting harm is more narrow, one of liability for a particular cause of action, that of wrongful death. This harm is very different in kind from what would have happened had the law not been changed; a wrongful death action was not even possible before the intervening change in the law. Accordingly, the fact that Wartnick's subsequent liability in the wrongful death action [2] could not "have otherwise result-

---

**2.** While Nachtsheim sought damages for both unjust enrichment and wrongful death, she prevailed only on the wrongful death claim. As-

suming Gainsley's advice constituted negligence, whether such negligence would have been the proximate cause of the liability for unjust en-

ed" from Gainsley's advice without the intervening change in the statute of limitations persuades us that the third element is satisfied.

The fourth element necessary to establish the presence of a superseding cause is the foreseeability of the intervening act. We have said in earlier cases that "the foreseeability of intervening causes is to be determined as of the time of defendant's acts or omissions." *Rieger v. Zackoski,* 321 N.W.2d 16, 21 (citing *Johnson v. Clement F. Sculley Construction Co.,* 255 Minn. 41, 52, 95 N.W.2d 409, 417 (1959)). While Wartnick argues that *Rieger* controls and mandates a conclusion that the legislative enactment was foreseeable, we hold that Gainsley could not foresee a change in the statute of limitations. At the time of Gainsley's allegedly negligent advice, the statute of limitations had run on the wrongful death action and there was no indication that the legislature would act to, in essence, create a cause of action to be applied retroactively. The language of the Restatement buttresses this conclusion. Among the considerations for determining whether something is a superseding cause is:

> [T]he fact that [the] operation or the consequences [of the superseding cause] appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation.

Restatement (Second) of Torts § 442(b) (1965). Here, looking back, the extraordinary nature of the subsequent verdict in the wrongful death action is obvious: the statute of limitations on that cause of action had run at the time the advice was given. One of the specific reasons for such limitations is, of course, to allow both counsel and parties some certainty as to the likelihood of future litigation. Attorneys

should not be held to a standard which requires them to anticipate such extreme and unlikely changes in basic law. Further, the "extraordinariness" of the outcome is illustrated by the fact that the legislature twice considered, and twice rejected, the amendment allowing the wrongful death action in this case before it was finally passed. Thus, we find the fourth element of the test for superseding cause is met.

The determination of proximate cause is normally a question of fact for the jury. *Vanderweyst v. Langford,* 303 Minn. 575, 576, 228 N.W.2d 271, 272 (1975). However, if reasonable minds cannot disagree, proximate cause becomes a question of law. *See Lyons v. SCNEI, Inc.,* 262 N.W.2d 169, 170 (Minn.1978). We believe reasonable minds cannot disagree that the amendment of the statute to create a whole new cause of action was a superseding cause of Wartnick's damages, and therefore Gainsley's fifth amendment advice, if originally negligent, was not the proximate cause of Wartnick's damages.

We affirm the decision of the trial court and the court of appeals dismissing the first two counts of malpractice regarding the fifth amendment advice.[3]

█ As to the remaining three counts of malpractice, both Wartnick and Gainsley have provided expert testimony regarding Gainsley's representation of Wartnick at the trial itself. Wartnick asserts that Gainsley's introduction of the polygraph issue in the opening statement, failure to investigate the murder adequately, and failure to mitigate the damage done by original deposition answers did not meet the standard of care of the community. In granting summary judgment on these issues, despite the conflicting expert testimony on the applicable standard of care, the

---

richment, an arguably more foreseeable claim, might be a much closer question than the case at bar. However, because the unjust enrichment was dismissed, plaintiff suffered no damages and therefore can make no claim of malpractice. The only question before the court today is whether Gainsley's act proximately resulted in the liability arising from the *wrongful death claim.*

**3.** The trial court granted summary judgment to Gainsley on the fifth amendment issue on two other grounds. Because we conclude that the statutory amendment was a superseding cause, eliminating any claim for negligence, we do not reach the alternate bases of the trial court's decision.

**116**

trial court essentially held as a matter of law that Gainsley had not breached the standard of care. The trial court found that the errors, if any, were errors in judgment.

 In a professional malpractice action, the plaintiff must present evidence of the applicable standard of care, and that the standard of care was breached. Generally expert testimony is required to establish these issues, unless the conduct can be evaluated by a jury in the absence of expert testimony. *Hill v. Okay Constr. Co.*, 312 Minn. 324, 252 N.W.2d 107, 116 (1977). This court has never explicitly held that these determinations are for the finder of fact. However, when conflicting expert testimony is given, these questions normally go to the jury. *See Ouellette*, 391 N.W.2d at 817; *Togstad*, 291 N.W.2d 686; and *Hill*, 252 N.W.2d at 116. If there are no factual disputes as to the standard of care and whether it was breached, if, for example the plaintiff does not provide necessary expert testimony on the issue, summary judgment is properly granted. *See Prawer v. Essling*, 282 N.W.2d 493, 495 (Minn.1979). There may be errors made by attorneys which do not constitute malpractice as a matter of law but are errors in judgment. *See Meagher v. Kavli*, 256 Minn. 54, 60–61, 97 N.W.2d 370, 375 (1959). However, a failure to meet the minimum standard of care required is not a "mere error in judgment." *Togstad*, 291 N.W.2d at 693.

Because judges in reviewing courts are lawyers, there is a normal tendency to act as a finder of fact when addressed with these issues of trial preparation and strategy, in a way a judge might not do if the experts were from a field outside law. However, it is the job of the reviewing court when reviewing the grant of a summary judgment motion to determine whether there are any questions of material fact and whether the trial court has erred in the application of the law. The record in this case is filled with conflicting testimony, by legal experts, on the applicable standard of care and whether Gainsley breached it. These conflicts are questions of fact, and are most appropriately answered by the jury.

The conflicting expert testimony on the questions of Wartnick's introduction of the polygraph issue in the opening statement, failure to investigate, and failure to mitigate the damage done by the original deposition answers provides questions of material fact as to what the applicable standard of care is within the community on these issues, and whether it was breached. We reverse the grant of summary judgment on these issues and remand to the district court for trial.

Affirmed in part, reversed in part and remanded.

COYNE, J., took no part in the consideration or decision of this case.