EDWARD B. DISHINGTON v. A. W. KUETTEL & SONS, INC.

96 N. W. (2d) 684.

May 15, 1959—No. 37,539.

*Lewis, Hammer, Heaney, Weyl & Halverson,* for appellant.
*Palmer, Hood, Crassweller & McCarthy,* for respondent.

MATSON, JUSTICE.

Plaintiff appeals from an order denying his motion for a new trial solely on the issue of damages or in the alternative for a new trial on all issues and granting defendant's motion for judgment notwithstanding the verdict and from the judgment entered pursuant thereto.

Prior and subsequent to February 4, 1956, plaintiff was employed by St. Mary's Hospital in Duluth as a maintenance engineer particularly responsible for electrical work. During the years 1955 and 1956 a new 9-story wing was under construction on the west end of the existing building. Seven principal contractors were engaged under the general contractor. Defendant was a subcontractor of the new wing and engaged by the principal contractors who held the steampiping, heating, and ventilating contract.

On Saturday, February 4, 1956—the date when plaintiff was injured —the exterior structure of the new wing was nearly completed. The steel superstructure was completed to the ninth floor. The masonry was up to about the seventh floor. On Saturdays no construction work was done, the outside doors were locked, and there was little light inside the new wing. The lightest area was near the west wall where plastic cloth covering the windows admitted some light. At about 11 a. m. plaintiff, aided by a flashlight, entered the new wing through a tunnel leading from the old building to the north side of the newly constructed part.

He had been ordered by the maintenance superintendent of the hospital to read the steam-condensate meters once per week, which meters were located in a subbasement in the new wing's northwest corner. These meters measured the amount of condensed steam used by and eventually paid for by the contractors.

After plaintiff had read the condensate meters, he did not retrace his steps eastward along the east-west corridor and tunnel back to the old building. Instead he proceeded southerly from the northwest corner along a north-south corridor parallel to the west wall of the new wing. He intended to go to the southeast corner of the new wing (where three electrical outlets connected to the hospital electrical circuit were located) to see if any construction workmen had left any burning lights connected to the hospital circuit. Although the subcontractors had their own separate electric meters in the subbasement of the new wing, plaintiff had found on previous occasions that the electrical subcontractor had attached some of its electrical equipment to the hospital circuit. Plaintiff testified that on previous Saturdays he had found strings of burning lights connected to the hospital circuit. Furthermore, on several occasions during construction, 60-amp. fuses on the hospital electrical circuit had blown, resulting in a complete shutdown of electric lights and appliances in the kitchen. Evidence existed from which the jury could find that the cause of the fuse blowouts was attributable to the use of the kitchen circuit for electrical tools and lights of the workmen.

The defendant had never used the hospital circuit outlets and there was no evidence that it had any notice or knowledge that any of the contractors had used them. Defendant had used only electrical current flowing through the heating contractor's separate meter in the subbasement of the new wing, under arrangement with the heating contractor.

In going in a southerly direction from the northwest corner, after having checked the condensate meters, plaintiff had a choice of two routes. These two north-south routes or corridors were separated from each other by a low wall or parapet of a height of 37 inches. The corridor to the east of this parapet was customarily kept open for the passage of workmen and the transport of materials. The one to the west of the parapet was occupied by the electrical contractor's workshop and by the

defendant's sheet metal shop. Plaintiff testified that he started to walk down the east side corridor but found it partially blocked by scaffolding whereupon he elected to turn back and enter the workshop corridor on the west side of the parapet. This latter corridor is flanked on the east by the parapet and on the west by the outside wall. Along the parapet are pillars located about 10 feet apart, and these pillars protrude into the corridor about 2½ feet. Opposite the parapet-wall pillars are corresponding outside-wall pillars which extend into the corridor about 13 inches. Although from the parapet to the outside wall the corridor has a width of 19 feet, its width between the opposing pillars is only 15 feet and 3 inches.

In entering the workshop corridor plaintiff first passed through the space used as an electrical workshop and then approached the space occupied by the defendant's workbench and sheet metal shaping machine. Defendant's workbench was 32 inches high, 7 feet wide, and 14 feet long and stood with its westerly end about a foot from the outside wall and its easterly end pointing at right angles toward the parapet-wall space between two pillars. Between the east end of the workbench and the parapet wall was a space about 4 feet wide. The two parapet pillars, however, protruded to such an extent that only about 1½ to 2½ feet clearance existed between the corner of each pillar and the corner of the workbench. Leaning or standing against the east end of the workbench were 27 sheets of 22-gauge sheet metal weighing over 33 pounds per sheet and 10 to 15 sheets of 24-gauge sheet metal weighing over 27 pounds per sheet. These sheets, each 3 feet wide and 8 feet long, were stacked together on edge, long side down, against the east end of the workbench. About 6 inches of the sheet metal stack extended from each side of the bench. The total weight of the metal was between 1,100 and 1,300 pounds. In aggregate the sheets were from 1¾ to 2 inches thick.

Plaintiff first observed the sheet metal when he was 4 to 6 feet from the bench. As he reached the bench he put his hand on the edge of the pile using it like a banister. When he reached the middle of the sheet metal stack, he again put his hand on the edge. The end sheets began to "feather." Plaintiff attempted to hold the pile in place but despite his efforts the whole pile of metal fell upon him, pinned his left foot under his right knee, and cramped plaintiff tightly against the parapet

wall. Unable to remove the sheets, plaintiff remained in this position for about a half an hour before help arrived.

Plaintiff brought this action alleging defendant's employees were negligent in improperly stacking the sheet metal in a position so nearly perpendicular that it would easily fall. Medical testimony indicated plaintiff has suffered a permanent 30-percent loss of the use of his right leg and that he probably will always limp and never be able to run. His medical and hospital expenses exceeded $2,500 and he had a loss of wages in excess of $700. The jury gave him a verdict of $6,192.

Did the trial court err in denying plaintiff's motion for a new trial on the issue of damages alone or in the alternative for a new trial on all issues, and in granting defendant's motion for judgment notwithstanding the verdict?

After ascertaining the legal status of defendant and plaintiff in respect to each other, we need only consider whether the evidence as a whole, taken in the light most favorable to the verdict, presented issues of negligence for the jury.

 We first turn to a consideration of defendant's status. Defendant alleges that as a construction subcontractor he occupies the same status as a possessor of land. Plaintiff asserts, however, that since the contract governing the construction does not specifically turn over possession of the premises to the contractors but rather indicates a sharing of possession between the contractors and the hospital, defendant does not occupy the position of a possessor of land. Plaintiff is in error. Restatement, Torts, § 384,[1] reads:

"One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to the same liability, and enjoys the same immunity from liability, *as though he were the possessor of the land,* for bodily harm caused to others within and without the land, *while the work is in his charge,* by the dangerous character of the structure or other condition." (Italics supplied.)

Comments following the above rule clearly show that *control* of the work, and not an actual transfer of possession by contract, is decisive.

---

[1]See, Mix v. City of Minneapolis, 219 Minn. 389, 398, 18 N. W. (2d) 130, 135.

*Comment g* states the rule is applicable so long as the one entrusted with the erection remains *"in charge and control of the erection"* (italics supplied) not so long as he remains in possession. *Comment h* provides that the one who erects the structure is subject to the same liability for bodily harm as the possessor *while the former "remains in charge of the work"* (italics supplied) not while he remains in possession of the premises.[2] *Comment b* provides that subcontractors also enjoy the benefits of the rule.

It is generally recognized that one who carries on activities on land on behalf of the possessor is subject to the same liabilities as the possessor,[3] and that one in control of the premises is under the same duty as the owner to keep the premises in safe condition.[4] We adopt the rule embodied in Restatement, Torts, § 384.

After having found that defendant occupies the position of a possessor, we are next concerned with plaintiff's legal status. We have applied the rule of Restatement, Torts, § 332, in determining who is a business invitee.[5] It reads:

"A business visitor is a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them."

Clearly plaintiff, in relation to the defendant, was not a business

---

[2]Gile v. J. W. Bishop Co. 184 Mass. 413, 68 N. E. 837, is not in point. In that case the owner used the same construction area for its regular business while the contractor was simultaneously carrying on its construction work. In other words, the contractor's servants and the owner's servants jointly used the same working area at the same time.

[3]Roberts v. Del Monte Properties Co. 111 Cal. App. (2d) 69, 243 P. (2d) 914; Restatement, Torts, § 383; see, Blackstone v. Chelmsford Foundry Co. 170 Mass. 321, 49 N. E. 635; Mix v. City of Minneapolis, 219 Minn. 389, 398, 18 N. W. (2d) 130, 135; 21 Minn. L. Rev. 338.

[4]Smith v. Henger, 148 Tex. 456, 226 S. W. (2d) 425, 20 A. L. R. (2d) 853; Patterson v. Pailey Mfg. Co. 360 Pa. 259, 61 A. (2d) 861; Powell v. Ligon, 334 Pa. 250, 5 A. (2d) 373; 38 Am. Jur., Negligence, § 94; cf. 65 C. J. S., Negligence, § 35i.

[5]Meyer v. Mitchell, 248 Minn. 397, 80 N. W. (2d) 450; Standafer v. First Nat. Bank, 243 Minn. 442, 68 N. W. (2d) 362; Zuercher v. Northern Jobbing Co. 243 Minn. 166, 66 N. W. (2d) 892; Yeager v. Chapman, 233 Minn. 1, 45 N. W. (2d) 776, 22 A. L. R. (2d) 1260.

invitee. No actual or potential economic benefit could inure to defendant as a result of plaintiff's presence in the new wing.[6] Plaintiff alleges that since no watchman was employed by any contractor, he was acting in that capacity. Defendant, however, did not request plaintiff to act as watchman and there is no evidence in the record indicating that defendant was even aware of plaintiff's presence for this purpose, or for checking hospital electric circuit connections, or for any other purpose. Evidence indicating the need of a watchman is extremely limited. In one instance a hospital employee heard but did not see children in the new wing. On February 4, 1956, of course, the brickwork was up to the seventh floor and all outside doors were locked. On other occasions, a "salamander" used for heating purposes remained lit and an oil burner remained smoking following the close of construction but there was no evidence of danger of fire from these heaters.[7]

■ Since plaintiff was not an invitee or a business visitor, he must be classified as a gratuitous licensee. We have also adopted Restatement's position in regard to duties owed to a gratuitous licensee[8] (Restatement, Torts, § 342):

[6]See, Meyer v. Mitchell, *supra;* Howard v. Minneapolis & St. P. S. R. Co. 171 Minn. 395, 214 N. W. 658; Prosser, Torts (2 ed.) § 78.

[7]Although the definition of a business visitor in Restatement, Torts, § 332, has been severely criticized because it embraces as an essential element a business purpose of some direct or indirect financial benefit to the possessor, this court has definitely rejected the suggestion that such definition be abandoned for an alternative rule of stricter liability. Meyer v. Mitchell, 248 Minn. 397, 80 N. W. (2d) 450. Such rejected alternative definition has been well stated by Dean Prosser in 26 Minn. L. Rev. 573, 612, as follows: ·
"When premises are not open to the public, the individual is not entitled to protection where he does not enter under circumstances giving him reasonable assurance that the place has been made safe for him; and this is true whether or not he confers benefit upon the occupier."
It is clear that such alternative definition would be of no help to plaintiff since the premises under construction were not open to the public. In fact, all doors leading to the site—with the sole exception of the one used by plaintiff and which was located inside the hospital proper—were locked on Saturdays.

[8]See, Meyer v. Mitchell, 248 Minn. 397, 80 N. W. (2d) 450; Malmquist v. Leeds, 245 Minn. 130, 71 N. W. (2d) 863; 13 Dunnell, Dig. (3 ed.) § 6984.

▄▄▄▄▄▄▄▄

"A possessor of land is subject to liability for bodily harm caused to gratuitous licensees by a natural or artificial condition thereof if, but only if, he

"(a) knows of the condition and realizes that it involves an unreasonable risk to them and has reason to believe that they will not discover the condition or realize the risk, and

"(b) invites or permits them to enter or remain upon the land, without exercising reasonable care

"(i) to make the condition reasonably safe, or

"(ii) to warn them of the condition and the risk involved therein."

Under the above rule, as applied to the facts of this case, there is no basis for holding defendant liable in negligence for plaintiff's injuries. Plaintiff personally testified that he observed the stack of sheet metal while he was 4 to 6 feet away and that it was then standing pretty close to perpendicular. Upon cross-examination he frankly admitted that from his experience as a workman he was well aware that a pile of sheet metal standing almost vertically on edge was likely to tip over. Clearly under the circumstances he was not only charged with, *but was actually possessed of,* knowledge of the laws of gravity. Despite his observation and such knowledge, he proceeded to walk alongside the stack of metal in such close proximity to the same that he slid his hand along the top edge as if he were using it as a banister.

Aside from plaintiff's own negligent conduct in knowingly exposing himself to an obviously dangerous condition, there is no reason why defendant should have realized or have reasonably foreseen that plaintiff, or any other person, would enter the workshop area, and that if he did so that he would fail to discover a manifestly dangerous condition or fail to realize the risk therefrom. The nearly perpendicular stack of sheet metal was in plain sight[9] in a sufficiently lit area and was therefore not akin to a trap.[10]

▆▆▆ In Blomberg v. Trupukka, 210 Minn. 523, 526, 299 N. W. 11,

---

[9] Plaintiff admitted it was light enough in that area so that he no longer found need for his flashlight.

[10] See, Page v. Murphy, 194 Minn. 607, 261 N. W. 443; Prosser, Torts (2 ed.) § 77.

13, this court appropriately said:

"* * * An act which exposes another to risk of injury only by his failure to conform to those rules of conduct for his own safety with which he might reasonably be expected to comply does not violate the standards of due care. A party has a right to assume that others will observe as a minimum the operation of well known natural laws. Prosser, Torts, pp. 232-234. The operation of the law of gravity is a matter of such common knowledge that all persons of ordinary intelligence and judgment, even if they are illiterate, are required to take notice of it. Olson v. McMullen, 34 Minn. 94, 24 N. W. 318. As to such matters there is no duty to warn for the simple reason that the purpose of a warning is to supply a party with information which he is presumed not to have. There is no necessity to warn against the obvious."

The trial court did not err in granting defendant's motion for judgment notwithstanding the verdict. Under the circumstances it becomes unnecessary to consider other issues.

The judgment of the trial court is affirmed.

Affirmed.